UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHARLES ALMOND, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 3:15 C 50291 |
| WEXFORD HEALTH SOURCE, INC., a Pennsylvania Corporation, JILL WAHL, M.D., BESSIE DOMINGUEZ, M.D. HECTOR GARCIA, M.D., DONALD ENLOE, and ASSISTANT WARDEN FASANO, | ) Judge Rebecca R. Pallmeyer ) ) ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Charles Almond, a prisoner in the custody of the Illinois Department of Corrections, suffered a serious knee injury in 2013, while Almond was incarcerated at the Dixon Correctional Center ("DCC"). The injury went undiagnosed for some time, and after nearly two years, Mr. Almond underwent surgery to repair his knee. On November 20, 2015, Almond filed this action against Wexford Health Services, a private firm that provides health care services to inmates at DCC, and against three physicians—Dr. Dominguez, Dr. Wahl, and Dr. Garcia—alleging that the 22-month delay in treatment violated his Eighth Amendment rights. He also asserts a state law claim of medical malpractice. Defendants move for summary judgment in their favor on all of Almond's claims. For the reasons stated here, the motion is granted in part and denied in part.

## BACKGROUND

Although represented by counsel, Plaintiff did not comply fully with the Local Rules direction that he provide a concise response to the movant's statement of undisputed facts. N.D. Ill. R. 56.1(b)(3). Instead, Plaintiff submitted his own statement of facts, which contradicts that of Defendants in many respects. The parties' competing statements support the following account.

The injury that gave rise to this suit occurred on May 16, 2013, when Mr. Almond tripped and fell while running in the prison yard. (DSUF ¶ 6; PSUF ¶ 2.) Mr. Almond walked back to his cell where he remained for the rest of the day. (DSUF ¶ 6-7; PSUF ¶ 2-3.) The next day, Mr. Almond reported to his job in the kitchen, but complained of knee pain and was sent to the healthcare unit, where he was seen by a nurse who gave him an ACE bandage, pain medication (Tylenol or Motrin), and crutches that, according to Plaintiff, lacked any cushions. (DSUF ¶ 8; PSUF ¶ 4.)

On May 18, Mr. Almond returned to the healthcare unit, where a nurse gave him a "lay-in" order, allowing Almond to remain in his housing unit, and prescribed Motrin for his knee pain. (DSUF ¶ 10; PSUF ¶ 4.) On May 21, Mrs. Colgan-Valdez, a Physician's Assistant (P.A.) at DCC, examined Plaintiff's knee, performing Thrower and Lachman's tests to check for knee ligament damage[1]; she concluded that neither test revealed knee ligament damage. (DSUF ¶ 11.) Neither the Thrower nor Lachman exams test for a quadricep tendon injury. (Dominguez Dep. 45:1-46:19, Nov. 7, 2018, [149-3].) P.A. Valdez ordered Motrin, and an Ace bandage, but discontinued the authorization for the use of crutches. (DSUF ¶ 12.) An x-ray taken the following day showed that revealed only "mild osteoarthritis and mild effusion" in Almond's knee, similar to normal wear and tear on joints. (DSUF ¶ 13, 18; Dominguez Dep. 42:11-23.) On May 31, Almond returned to the healthcare unit and was again examined by P.A. Valdez. (DSUF ¶ 14; PSUF ¶ 6.) The parties disagree on whether there was any improvement in Almond's knee at this point, but P.A. Valdez prescribed Naproxen and Motrin. (DSUF ¶ 14; PSUF ¶ 6.)

---

[1] Defendants did not shed light on either of these tests, but the court understands that the Lachman test is used to determine the nature and degree of ligament damage. *See* Edward P. Mulligan, et al, *The Reliability and Diagnostic Accuracy of Assessing the Translation Endpoint During the Lachman Test*, 2015 Int'l J. Sports Phys Therapy, 10(1): 52–61 (Feb. 2015) (available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4325288/) (last visited January 8, 2020).

Plaintiff continued to complain about his knee and request to see a doctor. On June 21, Almond was seen for the first time by Dr. Bessie Dominguez, a physician employed by Wexford Health Services, Inc.[2] (Wexford) and working at the DCC. (DSUF ¶ 3, 15-18; PSUF ¶ 8.) Dr. Dominguez noted swelling and a decreased range of motion in Plaintiff's knee, but she did not find any knots or hollowness above the knee (the typical signs of a quadricep tendon rupture). (DSUF ¶ 17.) She again prescribed Naproxen and Motrin and gave Almond a low bunk permit. (DSUF ¶ 15-18; PSUF ¶ 8; Dominguez Dep. 110:21-111:3.) Still experiencing pain in his right knee, Mr. Almond returned to the healthcare unit on July 15 and again saw Dr. Dominguez. (DSUF ¶ 20-22; PSUF ¶ 9-11.) Almond did not appear to be limping, and Dr. Dominguez again did not find knots or hollowness about the knee, but she noted that the knee was still swollen, and prescribed Prednisone and Motrin. (DSUF ¶ 20, 22.)

One month later, on August 15, Almond saw Dr. Dominguez for a third time, still complaining of pain in his knee. (DSUF ¶ 23-27; PSUF ¶ 12.) Dr. Dominguez was concerned about the continued swelling of the knee but did not suspect a tear in his quadricep tendon; rather, based on the prior x-ray and the chronic condition of the injury, she diagnosed Almond as suffering from right knee osteoarthritis with mild effusion. She prescribed Naprosyn and extended Mr. Almond's low bunk permit for an additional six months. (DSUF ¶ 24-26.)

Dr. Dominguez next saw Mr. Almond on August 28, when Plaintiff reported to the healthcare clinic after he discovered a "knot" or "lump" above his right knee. (DSUF ¶ 28-30; PSUF ¶ 13.) Dr. Dominguez examined the knee, and for the first time noted a "hollow area" above Plaintiff's right knee, leading the doctor to suspect, for the first time, that Mr. Almond may have ruptured his tendon. (DSUF ¶ 29; PSUF ¶ 13.) Wexford Health Sources, Inc. has a policy that, for non-emergency situations, a physician seeking to refer a prisoner for treatment off-site must first request a "collegial review," in which the Wexford utilization review management doctor

---

[2] Wexford Health Sources, Inc. is a private contractor providing healthcare services to Illinois prisons. (DSUF ¶ 5).

confers with the local medical director at the prison (in this case, Dr. Jill Wahl) to assess whether an off-site referral is warranted. (DSUF ¶ 39; PSUF ¶ 14.) Consistent with that policy, Dr. Dominguez requested a collegial review of her proposal that Plaintiff receive an off-site MRI and examination by an orthopedic specialist at the University of Illinois Chicago ("UIC") Hospital. (DSUF ¶ 30; PSUF ¶ 13.) Dr. Dominguez also ordered another x-ray of the knee and instructed Mr. Almond to apply an Ace bandage. (DSUF ¶ 30.)

On September 6, Dr. Dominguez saw Mr. Almond for a follow-up on his x-ray. (DSUF ¶ 31-33.) Dr. Dominguez noted in Mr. Almond's medical file that the mass above his knee appeared "much improved." (DSUF ¶ 32). She prescribed additional anti-inflammatory medication and a muscle relaxant and advised Mr. Almond that the request for an off-site visit had been submitted. (DSUF ¶ 33.) In response to Dr. Dominguez's request for a collegial review, on September 12, Dr. Wahl, the local medical director at DCC, examined Mr. Almond. (DSUF ¶ 34-37; PSUF ¶ 14.) Dr. Wahl observed an indentation, or a dip, above Plaintiff's right knee and suspected a torn quadricep tendon. (DSUF ¶ 36-37; PSUF ¶ 14.) Two weeks later, on September 25, Dr. Wahl held a collegial review with Dr. Garcia, a doctor from Wexford's utilization review management department. (DSUF ¶ 40-41; PSUF ¶ 15-16.) Both parties agree that on September 25, Dr. Garcia had not personally examined Mr. Almond and was not informed of the suspected quadricep tear. (DSUF ¶ 38, 40; PSUF ¶ 15-16.) Dr. Garcia denied the request for an MRI and orthopedic exam, choosing instead to focus on treatment that was available on-site. (DSUF ¶ 40-41; PSUF ¶ 15.)

On October 15, Dr. Wahl saw Mr. Almond and advised him that the request for an MRI and off-site visit was denied but that she planned to appeal that decision and also to request an ultrasound. (DSUF ¶ 42; PSUF ¶ 17.) Dr. Wahl also directed that Plaintiff undergo physical therapy. (DSUF ¶ 43.) The next day, October 16, Dr. Wahl and Dr. Garcia conducted another collegial review, this time a phone conference to review Dr. Wahl's request for an MRI or ultrasound of the knee. (DSUF ¶ 44; PSUF ¶ 17.) Dr. Garcia agreed that further testing was

4

appropriate, and approved the request for an ultrasound, which could be done on-site. (DSUF ¶ 44; PSUF ¶ 17.) A month later, on November 13, Mr. Almond underwent an on-site ultrasound, which showed a possible tendon tear of Almond's right quadricep. (DSUF ¶ 46; PSUF ¶ 18.) Based on this test, on November 27, Dr. Wahl appealed the September 25 denial of the request for an off-site MRI and orthopedic examination. (DSUF ¶ 48; PSUF ¶ 18.) Dr. Neil Fisher, a Wexford physician, reviewed the appeal and approved the request for an off-site MRI and orthopedic consult at UIC. (DSUF ¶ 48; PSUF ¶ 18.) Once an off-site referral is granted, the off-site facility handles scheduling; Defendants assert, and Plaintiff does not challenge, that Wexford employees have no control over the off-site MRI scheduling. (DSUF ¶ 50-51.)

On March 7, 2014, nearly five months after the request was approved, Dr. Amir El Shami, an orthopedic specialist at UIC, examined Mr. Almond's knee. (DSUF ¶ 52-55; PSUF ¶ 19-20.) Dr. El Shami diagnosed a chronic right quadricep tendon rupture, recommended an MRI and surgery by an orthopedic surgeon, and ordered a different knee brace for Mr. Almond. (DSUF ¶ 55; PSUF ¶ 19-20.) Back at the DCC, on March 20, Dr. Wahl saw Mr. Almond for a follow-up after his off-site examination. (DSUF ¶ 56.) Dr. Wahl noted Dr. El Shami's recommendation for an MRI and an orthopedic surgeon consultation, and filed a request for another collegial review to approve that recommendation. (DSUF ¶ 56.) Dr. Fisher approved the request on March 26. (DSUF ¶ 57). After some scheduling delays occasioned by UIC, staff there performed an MRI on May 20; the MRI confirmed Dr. El Shami's assessment of a chronic partial rupture of his right quadricep tendon. (DSUF ¶¶ 58, 60; PSUF ¶ 21.)

Almond nevertheless received no further treatment until October 7, when he was again taken to UIC to see Dr. El Shami, "by mistake," according to the doctor's notes. (DSUF ¶ 62; PSUF ¶ 22.) Dr. El Shami confirmed his initial assessment and again referred Mr. Almond to a surgeon. (DSUF ¶ 62; PSUF ¶ 22.) Finally, on January 22, 2015, Dr. Samuel Chmell, an orthopedic surgeon at UIC, examined Plaintiff's right knee and confirmed the need for reconstructive surgery. (DSUF ¶ 63; PSUF ¶ 24.) On March 3, approximately twenty-two months

5

after the May 16, 2013 injury, Dr. Chmell successfully operated on Plaintiff's right knee and set it in a cast. (DSUF ¶ 64; PSUF ¶ 24.) Almond saw Dr. Chmell for a post operation evaluation on March 9 and then again in June and October. (DSUF ¶ 65-68; PSUF ¶ 25-27.) At some point prior to the October appointment, the cast was removed and Plaintiff began physical therapy. (DSUF ¶ 67.)

On November 20, 2015, he filed this complaint, alleging that Wexford violated 42 U.S.C. § 1983 by maintaining a policy of deliberate indifference to serious injuries, and that Wexford's physician employees exhibited deliberate indifference towards Plaintiff's knee injury.[3] Plaintiff also brought a claim for medical negligence based on the treatment he received for his knee injury. Defendants Dr. Garcia, Dr. Dominguez, Dr. Wahl, and Wexford now move for summary judgment.

## DISCUSSION

**I. Legal Standard**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The party moving for summary judgment bears the burden of proving the absence of such a dispute. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). If the movant meets that burden, the nonmoving party then bears the burden to demonstrate that there is a genuine dispute of material fact, "such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 773 (7th Cir. 2012). The burden on the nonmovant "is not onerous," *Liu v. T & H Mach., Inc.*, 191 F.3d

---

[3] Plaintiff's Second Amended Complaint also included Dr. Louis Shicker who was the Illinois Department of Corrections Medical Director and Charles Fasano, the Assistant Warden at the DCC, as defendants. The claims against Dr. Shicker and Mr. Fasano were subsequently dismissed. *See* June 22, 2017 Order [97]; February 26, 2018 Order [127].

6

790, 796 (7th Cir. 1999), and the court "construe[s] all facts and reasonable inferences in favor of the nonmoving party." *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). To defeat the motion, however, the non-moving party must be able to point to more than the "mere existence of a scintilla of evidence in support of" his position. *Liu*, 191 F.3d at 796.

## II.     Statute of Limitations

Defendants argue, first, that Plaintiff's claims against Dr. Garcia and Dr. Dominguez are time-barred: Dr. Garcia was involved in treating Plaintiff on just two occasions, the last one being October 16, 2013. Dr. Dominguez was last involved in treating Plaintiff on September 6, 2013. Because Plaintiff's complaint was not filed until November 20, 2015, well more than two years after they last treated Plaintiff, Defendants Garcia and Dominguez contend they are entitled to dismissal.

Section 1983 claims filed in Illinois are subject to a two-year statute of limitations, *Tobey v. Chibucos*, 890 F.3d 634, 645 (7th Cir. 2018), triggered "when the plaintiff knows or has reason to know of the injury that is the basis of his action." *Devbrow v. Kalu*, 705 F.3d 765, 769 (7th Cir. 2013) (quoting *Sellars v. Perry*, 80 F.3d 243, 245 (7th Cir. 1996)). A plaintiff learns of his injury and its cause when he is diagnosed. *Id.* The Seventh Circuit has also recognized that "when the violation of the plaintiff's constitutional rights is a continuing one, the statute of limitations does not start to run any earlier than the last day of the ongoing injury." *Devbrow*, 705 F.3d at 770 (citing *Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001)). Under the continuing violation doctrine, the claim accrues "as long as the defendants had the power to do something about" it. *Heard*, 253 F.3d at 318.

Defendants argue that the cause of action here accrued when Dr. Dominguez and Dr. Garcia were last involved in treating Plaintiff—on September 6 and October 6, 2013, respectively—but the court is not able to make that determination as a matter of law. A plaintiff learns of his claim at the time he is diagnosed, but here the record is not clear as to when that happened. On August 28, 2013, Dr. Dominguez noted for the first time that she suspected a torn

7

quadricep and then requested an off-site referral for Mr. Almond. (DSUF ¶ 29; PSUF ¶ 13.) She evidently did not communicate her suspicion to Dr. Garcia, however, and he denied the request. Then, on November 13, 2013, an ultrasound showed a possible tear, but there is no evidence that anyone disclosed the results to Plaintiff at that time. (DSUF ¶ 46; PSUF ¶ 18.) On November 27, 2013, Dr. Wahl told Mr. Almond that the request for an off-site referral was approved, but that does not constitute communicating a diagnosis. *See* Pl's Dep. 55:20-56:6, April 18, 2018 [149-1]. Viewing the record in the light most favorable to Plaintiff on this issue, as the court must at this stage, *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010), he did not learn of his diagnosis until he saw Dr. El Shami on March 7, 2014. (DSUF ¶ 55; PSUF ¶ 19.) His complaint, filed on November 20, 2015, falls within the two-year statute of limitations.

### III.     Section 1983 Claim of Deliberate Indifference

"[T]he Eighth Amendment's proscription against cruel and unusual punishment [ ] impos[es] a duty upon the States, through the Fourteenth Amendment, 'to provide adequate medical care to incarcerated individuals.'" *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006) (quoting *Boyce v. Moore*, 314 F.3d 884, 888-89 (7th Cir. 2002)). In considering claims under the Eighth Amendment relating to medical treatment, the court will "perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016). Deliberate indifference is a "subjective standard" requiring a showing that defendants have "know[n] of the serious risk to the prisoner's health . . . and . . . [have] also consciously disregard[ed] that risk/need so as to inflict cruel and unusual punishment on the prisoner." *Johnson*, 433 F.3d at 1010 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837-38, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)). The Seventh Circuit has described deliberate indifference as "intentional or reckless conduct, not mere negligence." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010).

Defendants in this case do not dispute that Almond's ruptured quadricep tendon constitutes an objectively serious medical condition. *See Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014). They do, however, argue that the evidence does not support a finding of deliberate indifference on the part of any of the individual Defendants. The court addresses the evidence as against each of the Defendants below.

**a.     Dr. Dominguez**

Dr. Bessie Dominguez is the physician who first saw Plaintiff regarding his knee pain. Though Almond alleges he suffered his injury on May 16, 2013, he did not see Dr. Dominguez until June 21, after four visits with the nurse and P.A.s. (The month-plus delay in seeing a physician is part of Plaintiff's claim that the alleged constitutional violation is a product of Wexford policy. Pl.'s Second Amended Complaint, ¶34 [1].)

Plaintiff claims that during his first visit, Dr. Dominguez was "preoccupied" and denied his requests for an off-site evaluation of his knee. (PSUF ¶ 8.) Apart from her alleged demeanor, however, Plaintiff offers no evidence that he was deliberately indifferent to his complaints. To the contrary, Dr. Dominguez testified that on June 21 she examined Mr. Almond, and noted no knots or hollowness above his right knee. Dominguez Dep. 110:21-111:3. Dr. Dominguez has treated patients with quadricep tendon tears and knows that knots or hollowness above the knee are indicative of such tears, but she ruled out the possibility of a quadricep tear when she examined Plaintiff and instead provided him with pain medication. (DSUF ¶ 17.) Plaintiff may have disagreed with Dr. Dominguez's treatment plan, but this does not establish deliberate indifference. *Berry*, 604 F.3d at 441 ("Neither medical malpractice nor mere disagreement with a doctor's medical judgment is enough to prove deliberate indifference in violation of the Eighth Amendment."). Nor is the court troubled by Dr. Dominguez's failure to diagnose a quadricep tendon tear. The board-certified orthopedic surgeon who eventually performed the surgery on Almond testified that it would take a trained eye like his three to six months to diagnose this type of injury. Chmell Dep. 37:7-13, July 19, 2018, [149-6]. In any event, any failure to diagnose the

9

tear in the first consultation would amount, at worst, to malpractice, which again falls below the threshold of deliberate indifference. *Berry*, 604 F.3d at 441.

When Plaintiff next saw Dr. Dominguez, on July 15, 2013, she again examined his knee, again found no knots or hollowness, and still did not suspect a quadricep tear. (DSUF ¶ 22.) She prescribed additional medication to help with the pain and swelling and scheduled a follow-up appointment in a month. At his third visit, on August 15, 2013, Plaintiff's knee remained swollen and painful. This generated concern for Dr. Dominguez, who began to suspect arthritis or an infection as the cause of his pain. Based on the x-ray taken at the time of the injury and the ongoing pain, Dr. Dominguez diagnosed Almond as suffering from osteoarthritis with mild effusion and prescribed medication to help with this condition. Again, this evidence—that Plaintiff disagreed with the doctor's medical judgment, or believes her failure to diagnose a tear was negligent—does not support a finding of deliberate indifference. *Berry*, 604 F.3d at 441.

On August 28, 2013, Dr. Dominguez saw Almond again, and for the first time observed a hollow area above the knee, an indication of a possible ruptured tendon in Plaintiff's knee. The parties agree that this was the first time that Dr. Dominguez suspected a quadricep tear. (DSUF ¶ 22; PSUF ¶ 13.) Plaintiff contends this suspicion should have resulted in prompt treatment. Pl's Response to Defendant's Motion for Summary Judgment, 7 [157]. Instead, Dr. Dominguez filed a request for a referral with an off-site specialist, adhering to Wexford's policy requiring "collegial review" before sending an inmate to an off-site facility for treatment in non-emergency situations. To establish that this decision violated the Eighth Amendment, Plaintiff must present evidence from which a reasonable jury could find that Dr. Dominguez "[knew] of and disregard[ed] an excessive risk to [his] health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference." *Farmer*, 511 U.S. at 837. Whether Dr. Dominguez's failure to take more prompt action constitutes deliberate indifference is a close question, but the court concludes it is one for

10

a jury to decide. *See Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000) ("Whether a prison employee acted with deliberate indifference presents a question of fact.").

In *Petties v. Carter*, an inmate suffered a ruptured Achilles tendon in January, underwent an MRI in March, and saw an off-site specialist in July. 836 F.3d at 726-27. The prisoner later brought a § 1983 claim against the prison medical staff for deliberate indifference, and the trial court entered summary judgment for the defendants. *Id*. at 727. The Seventh Circuit reversed, finding material questions of fact precluding summary judgment. *Id.* at 731-33. Specifically, the court noted that the doctor's decision not to view the ruptured tendon as an emergency and refusal to send the inmate to the emergency room to obtain an MRI, which prolonged the inmate's pain, generated a question for the jury about whether the doctor demonstrated deliberate indifference. *Id.* at 733.

Here, similarly, a reasonable jury could find that when faced with a suspect tendon rupture, Dr. Dominguez acted with deliberate indifference in submitting an internal request for an off-site visit, a request that took nearly a month to process. Her decision not to process the situation as an emergency may have been a reasonable step; but the jury may also conclude that it caused unnecessary and unreasonable delay in arranging for proper treatment. Summary judgment is denied as to Dr. Dominguez.

**b.**  **Dr. Wahl**

Dr. Wahl, who was the local medical director at DCC in 2013, first saw Almond on September 12, in response to Dr. Dominguez's request for a collegial review. Dr. Wahl knew of the suspected quadricep tear, and indeed herself observed the "indentation or dip" above the right knee that is a common symptom of a quadricep tendon rupture. (DSUF ¶ 36-37; PSUF ¶ 14.) Like Dr. Dominguez, Dr. Wahl did not perceive this injury to be an emergency. As in *Petties*, the court concludes that a jury must decide whether Dr. Wahl's failure to refer Almond for prompt treatment constitutes deliberate indifference. 836 F.3d at 733.

Dr. Wahl continued treating Plaintiff for his knee injury, and after Dr. Garcia denied a request for an offsite evaluation on September 25, the record shows that Dr. Wahl disagreed and advised Almond that she planned to appeal the denial. (DSUF ¶ 38, 40; PSUF ¶ 15-16.) Dr. Wahl's disagreement supports the inference that she was aware of the serious nature of Plaintiff's condition; because she at all times had the option of sending him to the emergency room, a reasonable jury could find that her decision to follow Wexford's internal policy of seeking approval for off-site treatment contributed to the delay in Almond's treatment. The court notes, in particular, that after the denial of the first request for an MRI, Dr. Wahl submitted another request for a collegial review, this time asking for an MRI or ultrasound. (DSUF ¶ 44; PSUF ¶ 17.) Dr. Garcia approved the ultrasound, which could be done on-site and could also confirm the injury. (DSUF ¶ 44-45; PSUF ¶ 17.) Yet after the November 2013 ultrasound confirmed the quadricep tendon rupture, Dr. Wahl nevertheless appealed the prior request, again asking for approval to obtain an MRI which Almond did not receive for almost seven months and which apparently did nothing more than confirm the ultrasound findings. (DSUF ¶ 48; PSUF ¶ 18). The delay in getting the MRI and proceeding with treatment may support a finding of deliberate indifference.

True, a physician's decision not to send a patient to see an off-site specialist is ordinarily viewed as an exercise of medical judgment, not a constitutional violation. But such a decision may support a finding of deliberate indifference if it is blatantly inappropriate. *Pyles*, 771 F.3d at 411 (internal quotation marks omitted). In *Pyles*, the Seventh Circuit explained that "if the need for specialized expertise either was known by the treating physicians or would have been obvious to a lay person, then the 'obdurate refusal' to engage specialists permits an inference that a medical provider was deliberately indifferent to the inmate's condition." *Id.* at 412. Here, Dr. Wahl suspected a quadricep tendon rupture yet decided not to send Mr. Almond for immediate imaging or to see a specialist, but instead engaged in a course of treatment that prolonged the ultimate surgery that Plaintiff needed. *Berry*, 604 F.3d at 441 ("A significant delay in effective medical treatment also may support a claim of deliberate indifference, especially where the result is

prolonged and unnecessary pain."); *Petties*, 836 F.3d at 730 ("[A]nother type of evidence that can support an inference of deliberate indifference is an inexplicable delay in treatment which serves no penological interest.") [4] Plaintiff notes, further, that Dr. Wahl failed to comply with the post-operation recommendation that Almond return for a follow-up appointment after four weeks. *Cf. Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999) (holding that failure to follow a specialist's advice can amount to deliberate indifference). As Defendants see things, Dr. Wahl "provided Plaintiff with palliative and therapeutic treatment on-site at the Dixon Correctional Center—actions which are literally the antithesis of deliberate indifference." Def.'s Memorandum of Law in Support of Motion for Summary Judgment, 16 [153]. That Dr. Wahl provided some care does not by itself defeat an Eighth Amendment claim, however. *See Petties*, 836 F.3d at 729-30 ("Another situation that might establish a departure from minimally competent medical judgment is where a prison official persists in a course of treatment known to be ineffective."). Summary judgment is denied as to Dr. Wahl.

### c. Dr. Garcia

Dr. Garcia's involvement with Almond's care is limited to two collegial reviews. The first, on September 25, 2013, related to Dr. Dominguez' request for authorization of an off-site MRI and consultation with an orthopedist at UIC. Dr. Garcia denied that request and, for the reasons explained earlier, there appears to be material dispute about whether that denial constituted deliberate indifference. There is no indication in the record, however, that Dr. Garcia was aware of the suspected quadricep tendon rupture. (DSUF ¶ 40; PSUF ¶ 15; Garcia Dep. 30:7-10, Oct.

---

[4] The court declines to make findings concerning the appropriate treatment for Plaintiff's injury, but notes that some authority suggests the value of prompt treatment. *See* Subhadra Nori, *Quadriceps Tendon Rupture*, J Family Med Prim Care, 2018 Jan-Feb; 7(1): 257–260 (available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5958582/) (last visited January 8, 2020) ("For complete ruptures, open repair and reconstruction is required. Early repair is recommended to avoid retraction and atrophy of quad muscle. . . . Early diagnosis and prompt repair is crucial, to obtain optimal results.").

31, 2018, [149-2].) Indeed, Plaintiff has conceded as much, effectively acknowledging he cannot establish the subjective component of a claim of deliberate indifference on Dr. Garcia's part.

The second collegial review occurred on October 16, 2013, when Dr. Wahl requested an MRI or ultrasound. Dr. Garcia denied authorization for an MRI, but did approve ultrasound. Dr. Garcia was involved once more in the treatment of Mr. Almond, when he attended another collegial review on October 16, 2013. This time, the collegial request, from Dr. Wahl, was for an MRI or ultrasound. Dr. Garcia denied the MRI, but approved an ultrasound. To the extent Almond challenges that decision, his challenge amounts to no more than a disagreement with a medical opinion. *See Pyles v. Fahim*, 771 F.3d at 411 ("An MRI is simply a diagnostic tool, and the decision to forego diagnostic tests is 'a classic example of a matter for medical judgment.'" (quoting *Estelle v. Gamble*, 429 U.S. 97, 107, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)). "A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (citations omitted). Dr. Wahl asked for approval to conduct either an ultrasound or an MRI, to confirm her suspicion of a quadricep tendon rupture, and Dr. Garcia approved the ultrasound request. As two "minimally competent professionals" agreed that an ultrasound was sufficient to determine the scope of the injury the court is satisfied that denial of an MRI did not amount to a constitutional violation. Summary judgment is granted as to Dr. Garcia.

### d. *Monell* Claim against Wexford

Courts in this district generally hold a private corporation that provides municipal services liable for constitutional violations only if caused by (1) an express policy, (2) a widespread custom or practice, or (3) a decision by someone with final policy-making authority. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978); *Pittman ex rel.*

*Hamilton v. Cty. of Madison*, 746 F.3d 766, 780 (7th Cir. 2014); *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 674 (7th Cir. 2009).[5]

Plaintiff here has alleged the existence of a "wide spread practice" of failing to provide adequate healthcare at DCC. Pl.'s Second Amendment Complaint, ¶ 34 [66]. But Plaintiff has not produced any evidence of such a practice beyond the circumstances of his own right knee injury. One instance of deliberate indifference is not enough to support *Monell* liability resting on a practice or policy. *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009) ("[T]here is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, except that it must be more than one instance, or even three . . . ." (citations omitted)); *Cosby v. Ward*, 843 F.2d 967, 983 (7th Cir. 1988) ("There is no clear consensus among the courts as to what level of frequency of the challenged conduct evidences a custom, except that it must be more than one instance."). At minimum, the Plaintiff must show that "there is a policy at issue rather than a random event." *Thomas*, 604 F.3d at 303.

Plaintiff Almond has presented evidence of what he deems less-than-acceptable care for his knee injury. He has not offered evidence supporting the inference that this is an ongoing practice rather than an isolated incident. Summary judgment is granted as to Wexford.

**IV.   Medical Malpractice Claims**

Plaintiff did not respond to Defendants' argument for summary judgment on the medical malpractice claim. He has, thus, effectively admitted facts on which that argument is based. *Gerhartz v. Richert*, 779 F.3d 682, 685 (7th Cir. 2015). More importantly, Plaintiff has not presented expert testimony establishing the proper standard of care and its alleged breach by Defendants, as required by Illinois law. *See Tierney v. Cmty. Mem'l Gen. Hosp.*, 268 Ill. App. 3d

---

[5] The *Monell* doctrine is held to shield private corporations that perform government functions, but the Seventh Circuit has observed that there are "substantial grounds to question the extension of the *Monell* holding for municipalities to private corporations." *See Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 790–96 (7th Cir. 2014); *see also Pindak v. Dart*, 125 F. Supp. 3d 720, 764–65 (N.D. Ill. 2015).

1050, 1058, 206 Ill. Dec. 279, 285, 645 N.E.2d 284, 290 (1st Dist. 1994) ("Expert testimony is required to support a charge of medical malpractice because the assessment of the alleged negligence typically requires knowledge, skill, or training in a technical area outside the comprehension of lay people."). The expert who offers testimony in support of a claim of malpractice must ordinarily be licensed to practice in the relevant area, must be familiar with other physicians' methods and procedures, and must be qualified and competent to state an opinion regarding the standard of care. *Gill v. Foster*, 157 Ill. 2d 304, 316-17, 193 Ill. Dec. 157, 163, 626 N.E.2d 190, 196 (1993). Plaintiff did file a late affidavit pursuant to 735 ILCS 5/2-622(a)(1). Plaintiff's Motion to File Amended Exhibit A [89]. That exhibit includes a letter purportedly prepared by a physician—but the physician's name is not included, nor did the physician sign the letter.

Plaintiff might point to the testimony of Dr. El Sami and Dr. Chmell, the two UIC physicians who treated his injury, but Plaintiff failed to disclose Dr. El Hami and Dr. Chmell as experts, pursuant to FED. R. CIV. P. 26(a)(2). *See Musser v. Gentiva Health Servs.*, 356 F.3d 751, 756 (7th Cir. 2004) ("all witnesses who are to give expert testimony under the Federal Rules of Evidence must be disclosed under Rule 26(a)(2)(A)"). In any event, although Dr. El Shami and Dr. Chmel's status as general practitioners may not preclude their offering expert testimony on the standard of care, *Jones v. O'Young*, 154 Ill. 2d 39, 43, 180 Ill. Dec. 330, 332, 607 N.E.2d 224, 226 (1992), the foundation for such testimony appears inadequate. *Purtill v. Hess*, 111 Ill. 2d 229, 244, 95 Ill. Dec. 305, 311, 489 N.E.2d 867, 873 (1986) ("a foundation must be laid which demonstrates that the witness is familiar with the standard of care applicable to a defendant physician."). Specifically, nether Dr. El Shami nor Dr. Chmell reviewed Plaintiff's medical records from DCC. El Shami Dep. 11:8-11, July 26, 2018 [149-5]; Chmell Dep. 9:19-22. Indeed, Dr. Chmell specifically refused to render any opinions about the care Mr. Almond received at DCC. Chmell Dep. 9:23-10:6. The court dismisses Almond's malpractice claim without prejudice to renewal, if Almond can promptly bolster that claim with an appropriate expert affidavit.

## **CONCLUSION**

Defendants' motion for summary judgment [148] is granted in part and denied in part. Claims of deliberate indifference are dismissed as against Dr. Garcia and Wexford, but claims against Dr. Dominguez and Dr. Wahl survive this motion. Plaintiff's malpractice claims are dismissed without prejudice to renewal if he promptly supplements the record. The parties are encouraged to discuss settlement. A telephone status conference is set for January 30, 2020 at 8:30 a.m. Parties are directed to call this court's chambers' number on the date of the status conference.

ENTER:

Date: January 9, 2020

REBECCA R. PALLMEYER
United States District Judge